**UNITED STATES of America, Plaintiff-Appellee,**

v.

**David Terance TULEY and Frank Christian Oller, Defendants-Appellants.**

No. 75–3693.

United States Court of Appeals, Fifth Circuit.

Feb. 14, 1977.

Rehearing and Rehearing En Banc Denied April 25, 1977.

Ferriel C. Hamby, Jr. (Court-appointed) Harlingen, Tex., for Tuley.

Roland E. Dahlin, II, Federal Public Defender, Mike DeGeurin, Juan E. Gavito, Asst. Fed. Public Defenders, William W. Burge, First Federal Public Defender, Houston, Tex., for Oller.

Edward B. McDonough, Jr., U. S. Atty., James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before GEWIN, GODBOLD and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

David Terance Tuley and Frank Christian Oller appeal from convictions for violations of the federal laws relating to marijuana.[1] The basis of their appeal is that the district judge improperly denied their motions to suppress evidence.

On January 13, 1975, Special Agents Gabriel Bustamante and Carlos Torres of the Cameron County Organized Crime Task Force, Texas, received information from an unnamed, but "previously reliable", confidential informant that two men from Oklahoma, staying in rooms 113 and 133 of the Ramada Inn Motel, Brownsville, Texas, were planning to transport a large quantity of marijuana from the Rio Grande Valley area to the state of Oklahoma. The informant also disclosed that the suspects would be using two vehicles, a pickup truck with a camper, and a motor home, to transport the contraband. Upon receipt of this information, the Texas officers began a surveillance of the suspects. Observation quickly corroborated the informant's tip as to the description of the vehicles and the presence of the two suspects in the indicated rooms. The vehicles bore Oklahoma license plates, which verified the information that the men were from Oklahoma and supported to some extent the statement that they would transport marijuana to that state.

On January 15, 1975, Gary Morrison, an agent of the federal Drug Enforcement Administration (DEA), joined the surveillance.[2] At the suppression hearing, Morrison testified to the following:

> The surveillance had been started, initiated, upon information received by Cameron County Task Force Agent Carlos Torres . . .
>
> \* \* \* \* \* \*
>
> Agent Torres advised the other agents involved in the case that he had received information from a credible source that two men were in Brownsville, Texas, staying at the Ramada Inn in Rooms 113 and 133. These men were driving a pickup truck with a camper, and a motor home, and that they were here in the

---

1. Both appellants were charged and convicted under one count for conspiring to possess marijuana, with intent to distribute, in violation of Title 21, U.S.Code, Sections 841(a)(1) and 846, and one count for possessing 546 pounds of marijuana, with intent to distribute, in violation of Title 21, U.S.Code, Section 841(a)(1). Tuley

was also charged and convicted under one count for possessing 326 grams of marijuana, in violation of Title 21, U.S.Code, Section 844(a).

2. Morrison testified that he had participated briefly in the surveillance on January 14.

Valley to transport a quantity of marijuana north out of the Valley.

Agent Lofstrom [another D.E.A. agent] advised me that they had located two vehicles meeting the description, both with Oklahoma plates, at the Ramada Inn, and that these vehicles had also driven to South Padre Island to the Queen Isabella Inn where the drivers of the vehicles had been observed entering Apartment 1 and 2 of the Queen Isabella Inn.

Agent Lofstrom advised me that he had received information from another D.E.A. office that the renter of Apartment 1 and 2 of the Queen Isabella Inn, Robert Muller,[3] was involved in transporting large quantities of marijuana from the border area to the Oklahoma City Area.

Morrison and the other agents on January 15 followed a Chevrolet pickup truck with a camper, and a Champion motor home from the Queen Isabella Inn area, Port Isabel, Texas, to the Ramada Inn in Brownsville, Texas. At the motel, four people left the vehicles, went into room 133, and took articles from that room and placed them in the rear of the pickup truck. The two vehicles shortly returned to Port Isabel,

and the surveillance was discontinued for that day.

About noon the next day, January 16, Morrison and other agents resumed the surveillance of the pickup truck as it moved west, away from the Port Isabel area and in the direction of McAllen, Texas. As the vehicle proceeded along Highway 83, near Mercedes, Texas, Morrison and two other agents stopped the pickup truck, which was occupied by appellant Tuley and his Doberman Pinscher. A search of the vehicle produced a .38 caliber pistol under the front seat and some marijuana debris in the camper area. At that point, Tuley was placed under arrest and advised of his constitutional rights. Tuley was then taken to the Brownsville district office for processing.

At the Brownsville office, Tuley told Agents Morrison and Lofstrom that he was hired by unknown persons in Oklahoma City to come to Brownsville and Port Isabel, Texas, to assist in transporting a large quantity of marijuana to the Oklahoma City area. Later he told the agents that the marijuana was in a motor home situated on South Padre Island Beach. A search warrant was issued for the motor home,[4] and 546 pounds of marijuana were found

---

**3.** Muller was also charged in the same indictment with violations of the federal laws relating to marijuana and additional offenses. His motion for severance was granted, and he was tried separately, and convicted. An appeal from his conviction is docketed here as No. 75–4045.

**4.** The testimony of Morrison indicates uncertainty as to whether the information received from Tuley was part of the basis for the search warrant of the motor home:

Q. [by Government counsel]: Then what happened after you were told about the marijuana being in the motor home out on South Padre Island?
A. [Morrison]: I assisted Agent Lofstrom in preparing a search warrant for this motor home.
Q. Was a warrant issued?
A. Yes, it was.
The Court: That was based mainly on what Tuley had told you when he was arrested?
A. Yes Sir. The warrant was based on that and the information that Agent Torres had received earlier.

The Court: Had received earlier. But Tuley himself had told you that marijuana is in a motor home on South Padre Island. Was it the same motor home that was seen at the Ramada Inn?
A. Yes Sir, it was the same motor home. However, the information that Tuley told us concerning the marijuana being in the motor home was not included in the warrant as he advised us of that portion of the information after preparation of the warrant.
Record on Appeal (R.App.), Vol. IV, pp. 8–9.
Q. [defense]: . . . The search of the Champion motor home then did not take place as a result of anything Mr. Tuley told the officers?
A. [Morrison]: The search of the motor home took place as a result of a warrant . . . I'm not sure if any information that Mr. Tuley relayed is contained in the warrant or not. I don't remember.
R.App., Vol. IV, p. 18.

therein. Oller's arrest followed, on the basis of marijuana found in the motor home.[5]

A warrantless search is *"per se"* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent' circumstances." *Coolidge v. New Hampshire,* 1971, 403 U.S. 443, 474–475, 91 S.Ct. 2022, 2042, 29 L.Ed.2d 564. An exception exists as to the search of a moving vehicle, when probable cause exists for such a search. The seminal case as to warrantless searches of vehicles is *Carroll v. United States,* 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 453, where the Court held:

" . . . that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

"Having thus established that contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant, we come now to consider under what circumstances such search may be made.

\* \* \* \* \* \*

The measure of legality of such a seizure is . . . that the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes had contraband liquor therein which is being illegally transported."

267 U.S. at 153, 155–156, 45 S.Ct. at 285–286. *See Almeida-Sanchez v. United States,* 1973, 413 U.S. 266, 269, 93 S.Ct. 2535, 2537, 37 L.Ed.2d 596; *Chambers v. Maroney,* 1970, 399 U.S. 42, 49, 90 S.Ct. 1975, 1980, 26 L.Ed.2d 419; *Potter v. United States,* 5 Cir. 1966, 362 F.2d 493, 497.

Thus, to justify the stop and search without a warrant of the vehicle driven by Tuley in the present case, we must find that the officers had probable cause to believe that it contained contraband. Probable cause exists if "the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offence has been [or is being] committed . . . ." *Stacey v. Emery,* 1878, 97 U.S. 642, 645, 24 L.Ed. 1035. See *Spinelli v. United States,* 1969, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637; *Beck v. Ohio,* 1964, 379 U.S. 89, 91, 85 S.Ct. 223, 226, 13 L.Ed.2d 142; *Henry v. United States,* 1959, 361 U.S. 98, 80 S.Ct. 168, 171, 4 L.Ed.2d 134; *Brinegar v. United States,* 1948, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879.

In *United States v. Squella-Avendano,* 5 Cir. 1971, 447 F.2d 575, 580, this Court commented on the composite test of *Aguilar v. United States,* 1964, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, and *Spinelli, supra:*

"First, if the information provided is in such 'detail' and 'minute particularity' that 'a magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way,' then the report, if sufficiently incriminating, may, without more, be grounds for finding probable cause. Secondly, less detailed information from a reliable source may be used as grounds for a finding of probable cause if independent investigation by law enforcement agencies yields sufficient verification or corroboration of the infor-

---

**5.** A search warrant for Muller's quarters at the Queen Isabella Inn was then procured and executed, resulting in the discovery of a small amount of marijuana, 185 amphetamine tablets and numerous weapons, and Muller's arrest. As indicated, N. 3, *supra,* the counts of the indictment involving the charges against Muller were severed and tried separately. We are concerned on this appeal only with the legality of the first two searches, not the search of Muller's quarters.

mant's report to make it 'apparent that the informant had not been fabricating his report out of whole cloth.' Corroboration must render the report 'of the sort which in common experience may be recognized as having been obtained in a reliable way.' Thirdly, even a report that is not under the above two standards sufficient of itself to establish probable cause may count in the magistrate's determination of probable cause, but only as one of a number of other factors of 'further support' tending to show probable cause. Examples of satisfactory 'further support' given in *Spinelli* involved law enforcement agencies' knowledge of independent facts which suggest criminal conduct or of facts which take on an aura of suspicion in light of the informant's tip."

While here the source of the informer's information was not revealed, nor how the information was gathered, the detailed facts relayed to the agents and corroborated by them were of such a nature, in light of all the surrounding circumstances, that the district court could reasonably have inferred that the informer obtained his information "in a reliable manner and had substantial evidence on which to base his conclusion that the Defendants were probably engaged in criminal activity". Memorandum and Order of the District Court, p. 9.

In *United States v. Brennan*, 5 Cir. 1976, 538 F.2d 711, 720, this Court noted that "an accumulation of innocent detail conforming to the original tip" may have significant corroborative value. The agents in the present case had been informed, by an informer said to be credible, as to a number of particulars regarding the appellants Tuley and Oller, including where they were staying (motel and room numbers), that they were from Oklahoma, a physical description of the vehicles they would be using (which vehicles were found to have

Oklahoma license plates), and further that the men in question (Tuley and Oller) were about to transport large quantities of marijuana out of the Rio Grande Valley to Oklahoma. The agents, through surveillance and investigation, were able to corroborate the essentials of this information. In addition and of significance, the agents had received information from another DEA agent that the apartments which appellants had been observed visiting at Queen Isabella Inn were rented by one Robert Muller reported by that agent to be "involved in transporting large quantities of marijuana from the border area to the Oklahoma City area."

█ Thus, it seems reasonable to conclude that while these matters considered separately might not be a sufficient basis for probable cause, when the agents considered their combined cumulative effect, sufficient probable cause was present. It was coupled with the necessary exigent circumstances, a moving vehicle, *Carroll v. United States, supra,* headed on its way out of the Rio Grande Valley. A warrantless search of the camper Tuley was operating was constitutionally permissible. See *Whiteley v. Warden*, 1971, 401 U.S. 560, 567, 91 S.Ct. 1031, 1036, 28 L.Ed.2d 306; *Draper v. United States*, 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327; *Potter v. United States*, 5 Cir. 1966, 362 F.2d 493, 497–498.

█ The following search of Oller's motor home was likewise permissible. The results of the search of the camper added to the prior knowledge provided a sufficient basis for issuance of a search warrant. This is so whether or not the statements made by Tuley when he was arrested were or were not related to the magistrate who issued the search warrant.[6]

The convictions of appellants [7] are

AFFIRMED.

---

6. See footnote 4, *supra.* Assuming the legality of the initial search of the camper, the fruits of that search were properly used to establish probable cause in a subsequent search. *See Wong Sun v. United States*, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. The government

brief refers to the successive searches (a) of the camper, (b) of the motor home and (c) of Muller's premises as "piggy-backed" upon the preceding searches.

7. Appellant Tuley also urges that the trial court erred by refusing to allow Tuley to call his

GODBOLD, Circuit Judge, dissenting:

I believe that the warrantless search of the pickup camper driven by Tuley did not meet the standards of the Fourth Amendment. Since the search, with a warrant, of the mobile home was the fruit of the earlier search of the pickup, it too must fall.

### I. The Content of the Tip

At the threshold, there are significant errors relating to the content of the tip received by Officer Torres from the unidentified informant. They arose in the district court and have been carried forward into the majority opinion. Neither court can correctly determine whether a corroborated tip is sufficient probable cause until it correctly determines what the tip was.

District Judge Garza conducted a motion to suppress hearing June 10, 1975, on separate motions filed by Tuley, Oller and a third defendant, Robert Muller, whose case is not before us. Each defendant was represented by a different attorney.

The search of the pickup was conducted without a warrant and was first in time, and if invalid would affect the search (with warrant) of the mobile home driven by Oller, which, in turn, would affect the third search (with warrant) of Muller's apartment. Thus, the court took up the Tuley motion first. The burden was on the government. The only evidence it presented was testimony of DEA Officer Gary Morrison. The majority opinion quotes four paragraphs from his testimony. Only the first two relate to the content of the tip given to Officer Torres:

> The surveillance had been started, initiated, upon information received by Cameron County Task Force Agent Carlos Torres . . .
>
> . . . . .

Agent Torres advised the other agents involved in the case that he had received information from a credible source that two men were in Brownsville, Texas, staying at the Ramada Inn in Rooms 113 and 133. These men were driving a pickup truck with a camper, and a motor home, and that they were here in the Valley to transport a quantity of marijuana north out of the Valley.

The last two paragraphs, not here repeated, relate to corroborating information received from DEA Agent Lofstrom.

When one examines the first two paragraphs, the extent of the information conveyed by Torres to DEA agents was this: (a) two men were driving a pickup truck with a camper on it and a mobile home; (b) they were occupying Rooms 113 and 133 at the Ramada Inn, and (c) they were in the Rio Grande Valley to transport "a quantity of marijuana north out of the valley."

Morrison then testified concerning the details of surveillance and other events that the majority consider sufficiently corroborative. Also he stated that he typed the affidavit on the basis of which a warrant was issued for search of the mobile home. The affidavit was not introduced. The government rested, counsel for Tuley argued, and the court announced that Tuley's motion to suppress was overruled.

The court then took up Muller's motion. At this point the character of the proceedings changed. Up to then the inquiry had been to the contents of what the informer had told Torres, and Morrison had orally described this. Once Tuley's motion was overruled the inquiry changed to the sufficiency of affidavits supporting the warrants attacked by Oller and Muller. There was no reason for Tuley's counsel to even interest himself in what the affidavits said. His motion already had been denied, without

---

co-defendant, Oller, to the stand to question him in the presence of the jury to permit the jury to hear Oller's responses, including his refusal to testify on the grounds that his testimony would incriminate him and him alone. The point is without merit. Since Oller made it clear out of the jury's presence that he would

refuse to answer any questions concerning the case, (conceded by Tuley's brief, p. 20) the trial court did not err in refusing to allow Tuley to call Oller to testify for the primary purpose of that refusal being made before the jury. Cf. *San Fratello v. United States,* 5 Cir. 1965, 340 F.2d 560, pet. for reh. den. 1965, 343 F.2d 711.

"the affidavit" in evidence. With the burden on the defendant (since the search was with a warrant), Muller's counsel called Agent Lofstrom. He testified that he executed the affidavit for the Muller (apartment) warrant. The affidavit was not introduced.[1] Counsel for Muller argued, the court asked for comment from counsel for Oller, and he argued. Officer Torres, the recipient of the informer's tip, was present, the court suggested that he be called as a witness, and the government expressed willingness to call him. But it never did so. The court announced that the two warrants were valid and overruled the Muller and Oller motions.

Almost a month later, July 3, 1975, Judge Garza issued a written opinion and order denying the motions. With respect to Tuley, presumably he recognized that the content of the information which Morrison had described as coming from the informer, the two paragraphs quoted above, was not sufficient to constitute probable cause even if corroborated. He therefore ruled that he could consider the contents of "the affidavit" (presumably the one Morrison said that he typed). He then quoted from "the affidavit" the following as the content of information received by state officers from the informer:

> The informant advised that the male (sic) staying in rooms 113 and 133 of the Ramada Inn Motel, Brownsville, Texas, were soon to transport a large quantity of marijuana from the Rio Grande Valley area to the State of Oklahoma. The informant also stated the suspects would utilize a pickup truck with shell type camper and a motor home, both bearing Oklahoma license, to transport the marijuana.

It is quickly seen that this adds additional information to the calculus—that the marijuana was to be transported to the State of Oklahoma (rather than north out of the valley) and that the two vehicles had Oklahoma license plates.

In his opinion Judge Garza outlines the "precise details given by the informant" that were corroborated. He includes the Oklahoma license plates (which came from "the affidavit"). But that is not all. He also includes "the residences of the parties." This was not stated in Morrison's testimony or in the data quoted from "the affidavit." The majority adopts as the content of the tip the information quoted by Judge Garza from "the affidavit" with Judge Garza's [erroneous] addition of the information that the two men were "from Oklahoma."

It seems to me that an issue of constitutional dimension cannot be dealt with in this cavalier fashion. Possibly "the affidavit" was in the court's files and records, and, if so, possibly the court could take judicial notice of it before it entered a formal written order. But the difficulty is that the court bolstered the evidence after all the hearings were over and after its decision had been announced. Had Tuley's counsel known that the affidavit, though not in evidence, was to be considered he could have examined Morrison on why the statement in the affidavit was broader than his oral testimony, and which of the two was correct, and why he prepared an affidavit to be sworn to by Lofstrom. Nor is that all. Judge Garza's opinion erroneously states that both sides rested after Morrison and Lofstrom testified. We do not know whether his written order would have been the same if he had realized that on Tuley's motion the parties had rested and the motion had been denied before the hearing changed character and affidavits became significant, and if he had realized that no description of the tip contained any reference to the residence of the two men.

## II. Probable Cause

The tip to state Officer Torres from an unidentified informant, said by Torres to be a "credible source," even if we consider its contents to be as incorrectly described, fails both prongs of the test established in *Agui-*

---

1. No one testified concerning the affidavit (for the mobile home search) which Morrison had said he typed. It was not introduced.

*lar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).[2] *Aguilar* requires that the tipster's report inform the agents of (1) some of the underlying circumstances which justify concluding that he is credible or that his information is reliable, and (2) some of the underlying circumstances tending to demonstrate that, in the specific instance in question, he has drawn his conclusion of criminality in a reliable manner. Standing alone, this tip discloses no circumstances justifying a conclusion either that the informer is credible or that his information is reliable. There is no evidence that the informer was previously reliable except for the terse conclusory statement of Officer Torres that his information came from a "credible source." A generalized conclusory statement of this nature is insufficient, *Aguilar,* 378 U.S. at 114–15, 84 S.Ct. at 1513–1514, 12 L.Ed.2d at 729; *Davis v. Smith,* 430 F.2d 1256 (CA5, 1970), at least when standing alone, *United States v. Harris,* 403 U.S. 573, 579–80, 91 S.Ct. 2075, 2079–2080, 29 L.Ed.2d 723, 731 (1971). See *United States v. Love,* 472 F.2d 490, 495 (CA5, 1973). Second, nothing within the four corners of the tip tends to show reliability in the gathering of the information leading to the conclusion that illegal activity was afoot.

The majority, recognizing that the tip was insufficient to generate probable cause in support of the warrantless search, turn to corroboration, through surveillance, of "an accumulation of innocent detail conforming to the original tip," citing *United States v. Brennan,* 538 F.2d 711, 720 (CA5), *cert. denied,* —— U.S. ——, 97 S.Ct. 1104, 50 L.Ed.2d —— (1977) (No. 76–701). I read *Brennan*'s illumination of the kind of corroboration required by *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed. 2d 327 (1959), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), to require a finding of insufficiency here.[3]

I set forth the facts of the tip and subsequent corroboration in *Brennan* in order to demonstrate which facts the court subsequently relied on in according weight to the information contained in the tip. The informant had notified the DEA that Brennan was about to smuggle something into a certain airport. He described the plane by model, color, and tail number, and said it was hangared at this airport. He forecast that Brennan would install a 55-gallon auxiliary fuel tank in order to fly nonstop to Colombia and back. Later, he alerted authorities to the imminence of the smuggling operation, telling them that he inferred this conclusion from the details of the plane purchase. Finally, he said, Brennan had asked him to locate an overwater navigational device. The authorities discovered through independent investigation that this particular plane was indeed hangared at the airport. About three weeks later, they received word that the plane had taken off in a southwesterly direction. At 1:30 a. m. on the following day, customs agents sighted the same plane taxiing to its hangar, proceeding with its lights off.

The analysis in *Brennan* makes clear that probable cause was not founded on the amassing of innocent detail permitted after *Draper.* Judge Clark noted that mere corroboration of the suspect's ownership of the plane, even with the identification of the

---

**2.** *Aguilar*'s standards governed the sufficiency of an affidavit in support of a search warrant. The requirements of probable cause in searches without a warrant, involving an initial decision by the officer rather than by a neutral and detached magistrate, are at least as stringent as *Aguilar*'s, and may be more stringent. *United States v. Anderson,* 500 F.2d 1311, 1315 n. 8 (CA5, 1974).

**3.** At least one commentator, parsing the language of *Aguilar* and *Spinelli,* has argued that police corroboration of an informant's tip is only a way of satisfying *Aguilar*'s informant-

credibility prong. Only self-verifying detail (a la *Draper*) in the tip itself can boost the tip over the hurdle of the basis-of-knowledge prong. Comment, *The Informer's Tip as Probable Cause for Search or Arrest,* 54 Cornell L.Rev. 958, 960, 962, 963 & n. 30 (1969). Subsequent cases from this Circuit have, however, used corroboration as a means of satisfying both *Aguilar* prongs. *Brennan,* for example, speaks of the kind of information necessary "to corroborate an informant's tip." *United States v. Brennan,* 538 F.2d 711, 720 (CA5, 1976).

tail number, was "patently insufficient . . . ; this is precisely the type of innocent detail held to be of insufficient corroborative value in *Spinelli* itself." 538 F.2d at 720. Similarly, we have no *Draper*-type detail here. Indeed, we have even less of it than in *Brennan*. These are the external events and observations described by Judge Simpson as corroborative: (1) The described vehicles were indeed at the Ramada Inn; (2) they had plates from Oklahoma;[4] (3) the two occupants were in the named rooms at the motel. Regardless of how revealing one thinks these sorts of public or innocuous facts may be, they simply do not provide the "minute particularity" such that "a [court], when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way." *United States v. Squella-Avendano*, 447 F.2d 575, 580 (CA5), *cert. denied*, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971), quoting *Spinelli*, 393 U.S. at 417, 89 S.Ct. at 589, 21 L.Ed.2d at 644. My reading of the cases persuades me that the facts, either corroborative or as given in the original tip, have been more extensive than those provided here. See, *e. g., United States v. Waddy*, 536 F.2d 632 (CA5, 1976) (the tipster described, in addition to details provided here, the identity of the persons and the fact that the marijuana would be transported in suitcases); *United States v. Nieto*, 510 F.2d 1118 (CA5), *cert. denied*, 423 U.S. 854, 96 S.Ct. 101, 46 L.Ed.2d 78 (1975) (corroboration of general description of two men, nicknames, departure and arrival points, and license plate of car, held sufficient); *United States v. Anderson*, 500 F.2d 1311, 1316 (CA5, 1974) (tipster's corroborated description of mode of operation to include rental of two cars, one for local and one for interstate use, "evinced a knowledge of the inner workings of the appellants' system"); *United States v. Horton*, 488 F.2d 374, 379 (CA5, 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974) (tipster gave physical descriptions of suspects, sites of origin and arrival, model and license of car; police corroborated these details and also through extensive surveillance discovered a driving pattern not "in the manner of typical tourists or businessmen"); *United States v. Sellers*, 483 F.2d 37, 41 (CA5, 1973), *cert. denied*, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974) (tipster gave "detailed [though apparently uncorroborated] statements relating to the organizational procedures" of the gambling operation, *i. e.,* who gave the line and who handled layoffs); *United States v. Spaulding*, 462 F.2d 1346 (CA5), *cert. denied*, 409 U.S. 884, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972) (tipster related information similar to that provided here, plus points of origin and arrival, name of person to whom suspects would deliver heroin, and license number of car; police corroborated these facts and observed suspect carrying black box); *United States v. Drew*, 436 F.2d 529 (CA5, 1970), *cert. denied*, 402 U.S. 977, 91 S.Ct. 1682, 29 L.Ed.2d 143 (1971) (informant gave point of origin, location of past delivery, amounts and types of controlled substances, rough time of departure; surveillance corroborated these details and revealed that suspects were headed toward location of a prior delivery).

It is difficult to trace a consistent pattern in our probable cause decisions, since the cases must turn on their facts. My belief that the corroboration was insufficient in this case is drawn in large part from the Court's purpose in *Aguilar* and *Spinelli*. We allow the police to rely on unidentified informers to establish probable cause that *a crime is being committed*. *Whiteley v. Warden*, 401 U.S. 560, 567, 91 S.Ct. 1031, 1036, 28 L.Ed.2d 306, 312–13 (1971). The fact that the informer (even assuming that he is truthful)[5] accurately observes factual

---

4. Judge Simpson finds that the plates corroborate the residence of the occupants. As I have pointed out, no version of the tip contained that information.

5. My concern about the paucity of corroborative facts in this case is even greater because the government has fared no better in satisfying the other *Aguilar* prong, truthfulness. If, for example, the anonymous informant had proven himself right on prior occasions I would perhaps be more willing to accept such minimal corroboration of the informant's conclusions. Such an informant is not only presump-

occurrences, or receives facts from an accurate source and relays them on, is only of significance to the extent that it tends to prove the reliability of his conclusion on the critical score, *i. e.*, that the suspect is committing a crime. The corroboration is circumstantial evidence of his reliability as a describer of the particular criminal offense(s) of concern. His reliability as a describer in the abstract, or as a reporter that the sky is blue or that today is Tuesday, is really not what *Spinelli* and *Aguilar* are concerned with.

I am uneasy with the notion that an accumulation of "innocent"[6] details can be employed as an intellectual bridge to an inference of probable cause of criminal conduct. In his *Spinelli* concurrence, Justice White voiced a similar uneasiness about placing credence in a tip embracing a substantial number of facts that are readily available to the public at large.[7] In fact, Judge Clark noted in *Brennan* that the best type of corroboration is corroboration of "incriminating" details.

> Although there is no consensus on the type of information required to corroborate an informant's tip, it is generally agreed that the better practice is to obtain corroboration of incriminating details. *See Spinelli v. United States, su-*

*pra,* 393 U.S. at 414, 89 S.Ct. at 588, 21 L.Ed.2d at 642; Moylan, *Hearsay and Probable Cause*: An Aguilar *and* Spinelli *Primer,* 25 Mercer.L.Rev. 741 (1974). 538 F.2d at 720 (footnote omitted).

The problem of inferring probable cause of criminality from details that do not tend to show criminality is perhaps lurking behind several opinions which suggest that although *Draper's* "minute particularity" need not be "criminal" detail, it should be at least comprised of private facts tending to show that the informant has some personal pipeline to the suspect's scheme, rather than "public" information available to the world at large. See *United States v. Spach,* 518 F.2d 866, 871 (CA7, 1975) ("It is less relevant that [*Draper*-type] information is wholly innocent in itself than with corroboration of an informer's conclusions so long as the information is not common public knowledge"); *United States v. Larkin,* 510 F.2d 13, 15 (CA9, 1974) (information "could be readily obtained by any bystander observing the vehicle on the road from El Centro to Los Angeles"); *United States v. Hamilton,* 490 F.2d 598, 601 (CA9), *cert. denied,* 419 U.S. 880, 95 S.Ct. 145, 42 L.Ed.2d 120 (1974) (tip held not probative, given a "statement supported by nothing that was not open and obvious to anyone").

tively truthful but also historically accurate, an information-gatherer not easily duped by mere barroom rumors. *Cf. United States v. Sellers,* 483 F.2d 37, 41 (CA5, 1973), *cert. denied,* 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974) (suggesting that a very reliable informant such as an FBI agent allows for less evidence on the source-of-knowledge prong).

Of course, a prior record of 50 out of 100, while perhaps a good batting average, would be evidence of only questionable investigatory skill. The point here is that we have *no* description of this informant that can reassure us about his belief that criminality was afoot. He is a paradigm of anonymity.

6. I treat this word somewhat delicately due to problems of characterization. *See* Rebell, *The Undisclosed Informant and the Fourth Amendment: A Search for Meaningful Standards,* 81 Yale L.J. 703, 719 & n. 82 (1972).

7. "Unquestionably, verification of arrival time, dress, and gait reinforced the honesty of the informant—he had not reported a made-up story. But if what Draper stands

for is that the existence of the tenth and critical fact is made sufficiently probable to justify the issuance of a warrant by verifying nine other facts coming from the same source, I have my doubts about that case.

"In the first place, the proposition is not that the tenth fact may be logically inferred from the other nine or that the tenth fact is usually found in conjunction with the other nine. No one would suggest that just anyone getting off the 10:30 train dressed as Draper was, with a brisk walk and carrying a zipper bag, should be arrested for carrying narcotics. The thrust of Draper is not that the verified facts have independent significance with respect to proof of the tenth. The argument instead relates to the reliability of the source: because an informant is right about some things, he is more probably right about other facts, usually the critical, unverified facts."

393 U.S. at 426–27, 89 S.Ct. at 594, 21 L.Ed.2d at 650 (White, J., concurring).

Other cases have used *Draper* without commenting on the quality needed in the detail amassed by the tipster, but the facts themselves have indicated, for example, "a knowledge of the inner workings of the [suspects'] system." *United States v. Anderson,* 500 F.2d 1311, 1316 (CA5, 1974). *Cf. Spinelli, supra,* 393 U.S. at 427, 89 S.Ct. at 594, 21 L.Ed.2d at 650 (White, J., concurring). See also Comment, *The Informer's Tip as Probable Cause for Search or Arrest,* 54 Cornell L.Rev. 958, 965–66 (1969). We do not need to settle on this appeal whether the aggregation of detailed "non-incriminating" facts, or the quality of "non-incriminating" facts as suggestive that the informer is privy to private "inside" information, are legitimate legal standards. The facts and corroboration about the motel rooms, vehicles, license plates and home state of the suspects in this case are neither detailed nor private.

What ultimately convinced the *Brennan* court that it could credit the informer's tip there was not an amassing of "innocent," or even private, detail (either by tip or by corroboration) but the fact, disclosed by subsequent surveillance, that the suspect taxied his plane back to the hangar at 1:30 a. m. without turning on his lights:

> We conclude that, through a combination of hearsay information from the tip, preflight corroboration of some of the details, and the on-the-scene corroboration of Brennan's surreptitious landing at the predicted time and place, such probable cause in fact did exist.

\* \* \* \* \* \*

. . . At the point at which the law enforcement officials detected the Beagle aircraft proceeding down the taxiway in the dark with its lights off, at a time almost exactly that predicted by Dufresne in his estimate for the time required for a smuggling flight, the quantum-of-knowledge ring closed around Brennan in the manner approved by the Supreme Court in [*Draper*]. Through self-corroboration, equivocal information ripened into probable cause on the scene.

538 F.2d at 719–20, 721. See also *Fixel v. Wainwright,* 492 F.2d 480, 482 n. 1 (CA5, 1974) ("But most importantly, the officers observed the extremely suspicious actions of petitioner making trips to the backyard of his home and concealing the shaving kit there on the day of the arrest"); *United States v. Lopez-Ortiz,* 492 F.2d 109, 114 (CA5, 1974) (observation that suspects were unloading gunny sacks into their garage at 1:15 a. m. "reasonably arouses suspicion" and corroborates reliability of tip); *United States v. Solis,* 469 F.2d 1113 (CA5, 1972), *cert. denied,* 410 U.S. 932, 93 S.Ct. 1375, 35 L.Ed.2d 594 (1973) (one of the several important factors contributing to probable cause was "the suspicious behavior of Alainis and Solis when they arrived at the Rodeway Inn, where they drove slowly around the motel").

In sum, in this case there is no corroboration by facts that tend to show criminality or by conduct so abnormal that it is "suspicious" in the *Brennan* sense. Even after corroboration, the informer in this case could as well be a bellboy, a prankster, or a maker of malicious mischief as a reliable reporter of criminal activity by the defendants. The corroborating acts could be those of any two men—two clergymen or two members of this court—traveling to Padre Island for a fishing trip or to Mexico for a vacation.

The only other information that tends to impart reliability to the informer's conclusion of criminal activity is the last element tossed into the calculus at the end of Judge Simpson's discussion. This is the report, testified to by Morrison at the Tuley motion hearing, that the driver of the pickup had entered an apartment at the Queen Isabella that was rented by Robert Muller, who was, the report said, involved in transporting large quantities of marijuana from the valley area to the Oklahoma City area. This would tip the scale if it bore indicia of reliability. It would corroborate criminality. The suspect's entry into the Queen Isabella apartment was known because it was physically observed. But the critical nexus—the connection of Muller with that apartment and his status as a marijuana

transporter—bears no stamp of reliability. The report is said to have come from the DEA office in Oklahoma City. We do not know whether this information was founded upon prior convictions, another informant's tip, or some other basis. We have no way of determining that the agents' assertion of probable cause is not based upon "a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli,* 393 U.S. at 416, 89 S.Ct. at 589, 21 L.Ed.2d at 644. The information does not even rise to the level of a law enforcement officer's knowledge of Muller's reputation, as referred to in Part II of the opinion in *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).[8] If there was indeed such a basis for the report from the Oklahoma City office, it was unrevealed. Standing alone, the mere fact that law enforcement officials transmit the information cannot corroborate its reliability. Officer Morrison, for example, could have relayed to a third DEA office—Phoenix, Arizona, let us say—the tip that his office had received through Officer Torres, discussed above. Passing the report through the office, and vocal chords, of Officer Morrison to Phoenix could add nothing to its unknown reliability, any more than passing the original tip through Torres gave it authenticity. In the same manner, passing the "information" about Muller through the Oklahoma City office gave it no reliability as evidence corroborative of the original tip. See *Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306, 313 (1971). Significantly, Judge Garza did not rely upon this report as corroboration.

In this case we see surveillance which corroborates neither sufficient detail nor sufficient suggestion of criminal (or even suspicious) behavior so as to make the informant's tip (even as incorrectly described) a probative one. The mere observation of two men in the same motel rooms and same

cars with Oklahoma plates as predicted by an unknown informant cannot support that informant's conclusion that these same men were transporting marijuana to Oklahoma. Since there was no other probative evidence suggesting possession or distribution of marijuana by these two defendants, I cannot agree with the majority that the agents' search of the pickup was predicated upon probable cause.

---

8. *Harris* dealt only with the informant-credibility prong of *Aguilar*; it never considered what factors might satisfy the information-reliability prong since the tipster had personally observed and indeed purchased illicit whiskey. The por-

tion of the Chief Justice's opinion asserting that the affiant officer's personal knowledge of a suspect is adequate to satisfy this former prong represented solely his views and those of Justices Black and Blackmun.