**UNITED STATES of America, Plaintiff,**

v.

**Richard Elliot GRANT, Jr., et al., Defendants.**

**No. 79–165–Cr–JLK.**

United States District Court, S. D. Florida.

Sept. 19, 1979.

Dana D. Biehl, Special Attorney, Department of Justice, for the United States.

Dennis J. Cogan, Philadelphia, Pa., George Kokus, Miami, Fla., for Robert Jay Meinster.

Arnold C. Stream, Monasch, Chazen & Stream, New York City, for Robert Elliot Platshorn.

Melvyn Kessler, Miami, Fla., for Lynne Platshorn.

Rebekah J. Poston, Miami, Fla., for Eugene Arter Myers.

Samuel Sheres, Hallandale, Fla., for Randall Gene Fisher.

Gerald Kogan, Miami, Fla., for Modesto Echezarreta-Cruz.

Michael L. Brodsky, Miami, Fla., for Richard Elliot Grant, Jr.

Arthur W. Tifford, Miami, Fla., for Mark Stephen Phillips.

Denis Dean, Miami, Fla., for Carl Jerry London.

Bruce H. Fleisher, Coral Gables, Fla., for Ronald Benton Elliot.

## ORDER REVIEWING MAGISTRATE'S REPORT AND DENYING DEFENDANT'S MOTION TO SUPPRESS

JAMES LAWRENCE KING, District Judge.

The government has moved for the Court to review and reverse the Magistrate's proposed findings and recommended disposition of Defendant Grant's motion to suppress certain photographs and statements. After a careful review of the transcript of the evidentiary hearing conducted by the Magistrate and the memoranda filed by the parties, the Court concludes that the pertinent photographs and statements should not be suppressed.

On August 22, 1979 Judge Shapiro conducted an evidentiary hearing upon Grant's motion to suppress, pursuant to the Court's Order of July 31, 1979. In his report, Judge Shapiro concluded that the brief detention of Grant on April 5, 1978 constituted an arrest for which there was no probable cause. Moreover, Judge Shapiro found that Grant's offer to show the weapons to the agents was not voluntary. Hence, he recommended that the weapons, the photographs of the weapons, and the statements by Grant should all be inadmissible as fruits of the poisonous tree.

Magistrates may be designated to hear suppression motions and, in turn, requested to submit proposed findings of fact and a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Upon the filing of written objections to the Magistrate's proposed findings and recommended disposition, it is the obligation of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).

Since the government's motion seeking review did not specify the particular findings to which it objected, the most reasonable course of action for the Court to take was to regard the government's motion as objecting to the Magistrate's report in its entirety, except for those proposed findings of fact which the government substantially duplicated in its motion. Hence, the Court's de novo determination was with respect to the Magistrate's "Conclusions of Law" and to all contested findings of fact. The Court has the freedom to "accept, reject, or modify, in whole or in part" the Magistrate's proposed findings and recommendations. 28 U.S.C. § 636(b)(1).

The following summary constitutes the essence of Agent Eaton's testimony before Judge Shapiro. Agent Eaton was the only person to testify before Judge Shapiro and therefore this statement of the facts substantially corresponds to the Magistrate's findings.

On April 5, 1978 Agents Sams and Eaton were conducting surveillance of Grant based on information supplied by their informant, George Purvis. Purvis had told Eaton that Purvis was to fly to Columbia with Gregory Poulos "to retrieve a couple of pilots by the names of Steve Cassidy and Rocky Walker, and also bring back ten kilos of cocaine." Purvis said that he had been directed by defendants Platshorn and Meinster to commandeer the plane and force it to land at the Placid Lakes Airport where Grant would be monitoring police activity. Purvis told Eaton that Grant would have

smoke grenades, machine guns, and a night scope which might be used to secure the area. Purvis had further told Eaton that Grant was one of the "security men" or "muscle men" of the alleged Platshorn-Meinster operation.

The scenario for April 5, according to Purvis, was that he and Grant were to insure that Poulos would not retain the five kilos of cocaine (half of the shipment) which had been promised him. Grant and Purvis were to "blow him away" if Poulos caused trouble. At the time of these events, Purvis had been cooperating with Agents Eaton and Sams since March 15, 1978, or approximately 3 weeks.

When Sams and Eaton began surveillance at 6:30 p. m., Grant was parked at the airport as Purvis had indicated he would be. Grant also had a scanner and a two-way radio with him which also corroborated Purvis' report.

After two hours, Grant left the airport and stopped at a "7–11" store, whereupon Agents Sams and Eaton pulled alongside Grant's car. Sams got out of the agents' car and began to look through the windows of Grant's automobile. Seeing Sams, Grant ran from the store yelling at Sams "What are you doing to my car?" Believing Grant was threatening Sams, Eaton also got out of the car and yelled at Grant to stop. When Grant continued to advance and began to reach into his pants pocket, Eaton drew his gun, pointed it at Grant, and ordered him to halt. ("[I] told him not to move again or reach in his pocket again, or I would blow him away.")

According to Agent Eaton, Grant immediately responded by halting and saying "Are you cops? If you are looking for weapons, I have some in my trunk . . . I'll show them to you if you want because they are legal." After summoning other agents, Eaton requested that Grant open his trunk and the defendant complied with that request. Still at gunpoint, Grant showed the agents the weapons in his trunk—a Bushmaster machine pistol, an A/R 15, 30-round clips and cartridges, smoke grenades, and a night scope—and

Grant disarmed the weapons. Believing the weapons to be illegal automatic weapons, the agents seized them and gave Grant a receipt. The guns were determined to be only semi-automatic and legal for Grant to possess at the time. They were returned to him several days later. Grant was never taken into custody.

Photographs of the weapons confiscated and statements made at the time of the confiscation are sought to be suppressed by Grant.

## I. The Stop of Defendant Grant

█ Judge Shapiro concluded that defendant Grant had been subjected to an illegal arrest without probable cause, citing *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). The essence of the *Terry* opinion was the recognition that the Fourth Amendment protection against unreasonable search and seizure was implicated by the "seizure" of a person when he or she is forcibly stopped, even though the stop does not constitute a traditional arrest. However, when the stop does not rise to the level of a traditional arrest, the constitutional standard to be applied is not whether the officer had probable cause to make the stop but rather

> [w]ould the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?

392 U.S. at 21–22, 88 S.Ct. at 1880.

█ In *Terry* the "crux" of the case was not the propriety of the police officer's stop of the defendant but rather the propriety of the officer's frisk of the defendant "to determine whether [he was] carrying a weapon and to neutralize the threat of physical harm." 392 U.S. at 24, 88 S.Ct. at 1881. In the instant case, the agent's stop of the defendant was not investigatory as in *Terry*. Instead, the stop itself was intended to neutralize an immediate threat of physical harm to a fellow agent. The logic of Chief Justice Warren's majority opinion in *Terry* clearly covers this situation:

**404**

Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest.

392 U.S. at 23–24, 88 S.Ct. at 1881. Hence, the proper standard to apply to test the legality of Agent Eaton's initial stop of an advancing Grant was whether such action was objectively reasonable to protect the safety of a fellow agent and not whether he had probable cause for making an arrest.

■ The Supreme Court has held that an uncorroborated tip from a previously reliable informant justifies a forcible stop. *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). In this case, the informant had been cooperating with the agents for three weeks, his prior information had been reliable, and his information in this particular instance had been in part corroborated already. Agent Eaton acted reasonably in relying on this informant.

■ Purvis, the informant, had told the agents that Grant would be armed on this occasion and that Grant had served as one of the "muscle men" of the alleged criminal conspiracy. When Grant came out of the store yelling at Agent Sams, ignored Eaton's first order to halt, and began to reach into his pocket, Agent Eaton acted reasonably and properly in drawing his own firearm and again ordering Grant to halt.

## II. *The Search of the Trunk*

Although the agents acted reasonably and therefore legally in stopping Grant, such a conclusion does not automatically legitimize the search of the defendant's trunk. The government does not argue, as indeed it would have difficulty contending, that the search of the defendant's trunk was analogous to the limited frisk to protect the agents from physical harm which *Terry* condones.

There could be three possible bases for finding this warrantless search to be lawful: a) as a search incident to a legal arrest; b) as a search conducted upon the agents' probable cause belief that the trunk contained contraband (i. e., illegal firearms) and that the possibility of the automobile's removal constituted an exigency overriding the warrant requirement; or c) as a search to which the defendant voluntarily consented.

### A. *Incident to Arrest*

■ The first of these possible bases can be dismissed without extended discussion. No arrest, legal or illegal, occurred. Perhaps the agents did have probable cause to arrest Grant at the time of the search, for some conspiracy, based on the partially corroborated information of their informant. Perhaps the agents could have *then* searched his trunk. But the Court need not decide these questions because no arrest took place. Agent Eaton testified that, had Grant decided to run away, the agent would not have used their firearms to restrain him. Moreover, the following exchange during the hearing demonstrates that the agents themselves did not believe that they had arrested Grant:

Q (Mr. Brodsky): Did you or any other agent read Mr. Grant his *Miranda* rights?

A (Agent Eaton): I am not sure because he wasn't arrested or anything.

### B. *Probable Cause*

■ With respect to a second possible basis for the search, i. e., the agents may have had probable cause to believe that the trunk contained contraband, the test adopted in the Fifth Circuit provides that:

probable cause to search an automobile exists when facts and circumstances

would lead a reasonably prudent man to believe that the vehicle contains contraband.

*United States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977); *accord., United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978) (en banc). In particular, the Fifth Circuit has held in a number of cases that partially corroborated information supplied by a previously reliable informant would establish probable cause for a search. *See, e. g., United States v. Tuley*, 546 F.2d 1264 (5th Cir. 1977); *United States v. Waddy*, 536 F.2d 632 (5th Cir. 1976). *Compare, United States v. Ballard*, 573 F.2d 913 (5th Cir. 1978).

Certainly, the agents had probable cause to believe that there were firearms in Grant's car. In this case, the agents had been told by an informant that the defendant would have machine guns in his possession. The informant, George Purvis, had been cooperating with the government for three weeks prior to this incident. His prior information had been reliable. Moreover, his information to the government in this instance had been corroborated in part. He had told the government that he would be flying to Columbia in furtherance of the alleged conspiracy and indeed he did leave the United States in the manner he had indicated. Purvis also reported that Grant would be waiting at the Placid Lakes Airport for his return. In fact, as indicated, Grant was waiting at the airport when Agents Sams and Eaton began their surveillance. Purvis further reported that Grant would be monitoring police activity and would be prepared to communicate with the returning airplane. The agents were able to verify that Grant had a scanner and a two-way radio on the hood of his car while he waited for two hours at the airport.

The possession of firearms is illegal in a variety of circumstances. For instance, the possession of a firearm by a convicted felon may violate federal law. 18 App. U.S.C. § 1202(a)(1). The possession of a firearm which is not properly registered also violates federal law. 26 U.S.C. § 5861(d). Yet another violation of federal law occurs when one carries a firearm *unlawfully* during the commission of a felony. 18 U.S.C. § 924(c)(2). Finally, it is illegal under Florida law for anyone to possess a machine gun except as permitted by federal law. Section 790.221(1) & (3), Florida Statutes. However, no law makes the simple possession of a firearm, nor the simple possession of a machine gun, automatically illegal.

Probable cause to believe that Grant had guns or machine guns in his automobile is not equivalent to probable cause that such possession was illegal. The informant had not indicated to the agents that Grant was a convicted felon, or that he did not have a permit for his weapons, or that they were otherwise illegal. Moreover, even if the agents had probable cause to believe that Grant was participating in some felonious activity and that he had a weapon in his car, that does not give rise to probable cause that the weapons in his car were in violation of 18 U.S.C. § 924(c)(2) since that provision prohibits only firearms carried *otherwise unlawfully. See Perkins v. United States*, 526 F.2d 688, 690 (5th Cir. 1976); *United States v. Soria*, 519 F.2d 1060, 1063 (5th Cir. 1975). The distinction may seem like a fine one, but it was borne out in this very case. Grant *did* have some semi-automatic weapons in his trunk, but the government concedes that his possession of them was lawful. Absent further evidence that the agents knew of some facts indicating that the possession of firearms was illegal, they had no probable cause to believe that his car contained contraband. Since the agents had no probable cause to search the trunk, the Court need not reach the issue of whether the mobility of the defendant's car presented an exigency sufficient to dispense with the warrant requirement. *See generally United States v. Mitchell*, 538 F.2d 1230 (5th Cir. 1976) (en banc).

### C. Consent

■ The third possible basis for the legality of the search is the purported consent of the defendant. A search based on consent does not require probable cause. *Unit-*

ed States v. Ellis, 547 F.2d 863, 866 (5th Cir. 1977). Defendant Grant's memorandum of law contends that his consent was not voluntary, relying principally on the Supreme Court's decision in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The Magistrate also relied on *Brown*. However, such reliance is misplaced.

■ In *Brown*, the evidence sought to be suppressed included a confession and other inculpatory statements made following a police break-in of the defendant's apartment and his illegal arrest. The Court held that in such a case the voluntariness of the defendant's statements must be shown to be " 'sufficiently an act of free will to purge the primary taint (of the illegal arrest).' " 422 U.S. at 602, 95 S.Ct. at 2261, quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). As noted above, in the instant case the stop of Grant was a legitimate police response to a reasonable belief that the physical safety of the agents was endangered. The defendant's statement with respect to the weapons and his offer to show them to the agents immediately followed this legal stop. Hence, there was no "taint" to be purged under *Brown*.

Of course, under the Fourth Amendment, the interests and policies behind the exclusionary rule are not satisfied simply because the original stop was lawful. In *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the defendant did not allege that the original stop of his car was unlawful and yet the Supreme Court held that the government had to show that the purported consent to search the car was voluntarily given. As the government has noted in its motion to review the Magistrate's report, whether the consent to search was voluntary is to be determined factually from the totality of the circumstances. 412 U.S. at 227, 93 S.Ct. at 2047–48.

The circumstances in this case indicate that Grant's consent was voluntary. The one factor which might support a contrary result is that the defendant's offer was made at gunpoint. Nonetheless, the Court finds persuasive the government's contention that "while this single factor sounds very powerful at first, a close examination of the facts will reveal that the consent to search was voluntarily made."

Here, the defendant spontaneously volunteered the information that he had guns in his trunk and that the agents could look at them. This offer was made almost instantaneously upon his being stopped. Most of the recent cases discussing whether consent to a search was voluntary have involved consent given following police questioning or a police request to search. *See, e. g., United States v. Villarreal*, 565 F.2d 932 (5th Cir. 1978); *United States v. Almand*, 565 F.2d 927 (5th Cir. 1978); *United States v. Hall*, 565 F.2d 917 (5th Cir. 1978); *Mason v. Pulliam*, 557 F.2d 426 (5th Cir. 1977); *United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977). That Grant made his offer to show the agents his weapons without prompting and even before the agent had an opportunity to ask him *any* questions is a most powerful indication that his consent was freely given. An additional factor to consider is the defendant's knowledge that his guns *were* lawful, as demonstrated by Agent Eaton's testimony.* As the Fifth Circuit has held, the defendant's belief that no incriminating evidence would be found supports the voluntariness of his consent to search. *United States v. Hall*, 565 F.2d 917, 921 (5th Cir. 1978). Here, the defendant knew his guns were lawful and apparently did not think they could otherwise incriminate him.

There is no evidence suggesting that Grant's personal characteristics (age, experience, education, etc.) render him unable to make a voluntary decision to consent to a search. That Grant was not told he could refuse to permit a search and that he was

---

* Agent Eaton testified that Grant said immediately upon stopping, "Are you cops? If you are looking for weapons, I have some in my trunk . . . . I'll show them to you if you want because they are legal." His testimony is uncontradicted.

not given *Miranda* warnings are not dispositive and, in fact, of dubious relevance given the spontaneity of his offer. Finally, the fact that Agents Sams and Eaton awaited the arrival of other agents before letting Grant open the trunk appears to have been a reasonable response to the possible danger of permitting the defendant access to weapons.

The Court also notes that this is not a case where the agent's search went beyond the limited consent given. *See Mason v. Pulliam,* 557 F.2d 426, 429 (5th Cir. 1977). Grant consented to showing the agents the weapons in his trunk and that was the extent of the search conducted. Moreover, this is not a case where the consent was procured by trick or where the defendant did not know the criminal nature of the agents' investigation. *See United States v. Tweel,* 550 F.2d 297 (5th Cir. 1977). Indeed, the defendant's offer to show the agents his weapons was contingent upon their status as policemen. *See* n. * *supra.*

Based on all the circumstances of this stop and search, the Court concludes that Grant's consent was freely and voluntarily given. With no "poisonous tree," the photographs of the weapons and the statements made by Grant cannot be "fruits of a poisonous tree." They should not be suppressed.

Finally, the Court notes that the elements which make this consensual search permissible under the Fourth Amendment clearly also make it voluntary for the purposes of the Fifth Amendment ban on compelled self-incrimination. The Court does

ORDER AND ADJUDGE that the defendant's motion to suppress is denied.

DONE AND ORDERED in chambers at Miami, Florida, this 19th day of September, 1979.