**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Leonor Amanda AFANADOR and Blanca Nubia Vidal-Garcia,**
**Defendants-Appellants.**

No. 77–5303.

United States Court of Appeals, Fifth Circuit.

Feb. 17, 1978.

Shava Estrumsa, Miami, Fla., for defendants-appellants.

Jack V. Eskenazi, U. S. Atty., Richard A. Woolf, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before GOLDBERG, AINSWORTH and FAY, Circuit Judges.

GOLDBERG, Circuit Judge:

Appellants Blanca Nuba Vidal-Garcia (Vidal-Garcia) and Leonor Amanda Afanador De Cabrera (Afanador) were charged in the Southern District of Florida with importation of cocaine, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1) and 18 U.S.C. § 2, and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. An evidentiary hearing on a motion to suppress the cocaine seized from both appellants was held on February 17, 1977. The U.S. Magistrate, on the basis of the facts developed at that hearing, denied the motion to suppress. On March 7, 1977, the district judge, after argument, reaffirmed his earlier adoption of the magistrate's ruling and, in a joint bench trial, adjudicated the defendants guilty on all counts. The sole question presented on appeal is whether the cocaine, discovered in the course of "strip searches" of the appellants conducted by customs officers on appellants' entry into the United States, should have been suppressed as the product of an illegal search.[1]

## I. Facts

The facts are largely undisputed. Appellants Vidal-Garcia and Afanador were stewardesses for Aerocondor Airlines. On either the first or second day of January, 1977, Gaston Cairo, a special agent for the Drug Enforcement Administration (DEA) in Miami, received information that appellant Vidal-Garcia would be coming into the country carrying an unknown quantity of cocaine. While Agent Cairo apparently had not had prior contact with the informant, Cairo did determine that the informant had no criminal record. The informant had not previously supplied information to the DEA and was not paid for the information regarding Vidal-Garcia. The confidential source stated that Vidal-Garcia would be bringing in the contraband; that she would be traveling as a stewardess for Aerocondor Airlines; that she would be arriving in Miami from a foreign country (Colombia) on a particular flight (Aerocondor 204) and date (January 3, 1977); and that she would be "carrying"[2] a particular type of contraband, cocaine.

Upon the Aerocondor flight's arrival from Bogota at Miami International Airport, the information received by DEA was partially verified by customs authorities: Vidal-Garcia indeed arrived as a stewardess on the specified flight and date. A primary examination of the crew's luggage was conducted at the customs enclosure. There is nothing in the record to suggest that this examination revealed anything suspicious. Nor is there any suggestion that Vidal-Garcia or other members of the crew were subjected to questioning on their arrival by the customs authorities. Solely on the basis of the partially verified confidential tip regarding Vidal-Garcia, customs inspectors were instructed by their supervisor, Senior Inspector Anthony Hopkins, to search all six members of the Aerocondor crew.

A body search was first performed on appellant Afanador. After determining that nothing was concealed on the upper

1. The trial below was conducted almost entirely on the basis of stipulated evidence. Appellants proceeded on the basis that there were virtually no issues of fact in this case; nevertheless, appellants pleaded not guilty in order to preserve their right to an appeal on the suppression issue. *See United States v. Sepe,* 486 F.2d 1044 (5th Cir. 1973) (en banc).

2. The printed record is somewhat ambiguous as to whether the confidential informant specified the mode of carrying. Both the government and the appellants apparently understood Cairo's testimony as referring to a body carry, and we find nothing in the record inconsistent with that understanding. The government's brief refers to the tip as identifying Vidal-Garcia "as a potential body carrier." Government Brief at 6. The appellants' brief confirms this understanding at two separate points. Appellants' "Statement of the Facts" specifies that "a confidential informant advised . . . Cairo . . . that Vidal-Garcia, a stewardess, would body carry cocaine from Colombia into the United States . . . ." Appellants' Brief at 4. The same brief later states "The tip was that a body carrier would arrive." *Id.* at 20.

portion of Afanador's body, the female customs inspectors directed Afanador to lift her skirt and lower her girdle. After some confusion resulting from language difficulties, Afanador did so, revealing two packages, later determined to contain cocaine, one located on the body surface in the crotch area and one taped slightly below the waist. Afanador then removed the packages and handed them to the customs inspector. A similar strip search of Vidal-Garcia, conducted somewhat later, revealed two packages carried in the same manner. These packages were also determined to contain cocaine. Customs inspectors failed to discover contraband in their searches of the other four crew members.

## II. The Legal Standard

■ Appellants contend that they were searched illegally in that the customs inspectors lacked the requisite degree of suspicion to conduct strip searches. Appellants recognize "that certain genres of search or seizure based upon less than probable cause are constitutionally legitimate," *United States v. Himmelwright*, 551 F.2d 991, 994 (5th Cir. 1977), and that the "matter-of-course search of luggage at the border typifies one such genre[.]" *Id.* Appellants also recognize that this court has upheld more intrusive strip searches at the border when based on "real or reasonable suspicion," a standard falling short of probable cause. *Perel v. Vanderford*, 547 F.2d 278 (5th Cir. 1977). The primary thrust of appellants' argument on this appeal is that this court should adopt the "real suspicion" standard and the accompanying jurisprudence developed by the Ninth Circuit to govern cases involving intrusive border searches. *See, e. g., United States v. Guadalupe-Garza*, 421 F.2d 876 (9th Cir. 1970); *see also United States v. Williams*, 459 F.2d 44 (9th Cir. 1972). This path has already been considered and rejected by this circuit in *United States v. Smith*, 557 F.2d 1206 (5th Cir. 1977), a case decided subsequent to the submission of appellants' brief in this case. *See also United States v. Himmelwright, supra*, 551 F.2d 991. *Smith* and *Himmelwright* review the experience of the Ninth

Circuit in its attempt "to establish standards of fourth amendment reasonableness which demand some degree of articulable suspicion without requiring full-blown probable cause," *Himmelwright, supra*, 551 F.2d at 994, and conclude that "the 'reasonable suspicion' standard is flexible enough to afford the full measure of protection which the fourth amendment commands." *Id.* at 995; *Smith, supra*, 557 F.2d at 1208. In rejecting the highly taxonomic approach adopted by the Ninth Circuit in favor of this more flexible standard, we of course recognize that "the greater the intrusion, the greater must be the reason for conducting a search that results in such invasion." *United States v. Love*, 413 F.Supp. 1122, 1127 (S.D.Tex.), *aff'd*, 538 F.2d 898 (5th Cir.), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 628 (1976); *see Almeida-Sanchez v. United States*, 413 U.S. 266, 279, 93 S.Ct. 2535, 2542, 37 L.Ed.2d 596 (1973) (Powell, J., concurring); *Himmelwright, supra*, 551 F.2d at 994. Thus, what constitutes "reasonable suspicion" to justify a particular search may not suffice to justify a more intrusive or demeaning search. Our task in this appeal is to continue the case-by-case analysis which infuses the "reasonable suspicion" standard with more specific content. While we cannot rubricate any general rule, in finding that one of the challenged strip searches passes constitutional muster while the other does not, we begin at least to set the parameters of "thou shalt and thou shalt not" in this delicate area.

## III. The Standard Applied: Vidal-Garcia

■ The government does not, nor could it, contend that the confidential tip received here meets the twin tests of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). As this court recently stated, the

two-prong *Aguilar-Spinelli* standard requires that before probable cause for a

search with or without a warrant can be said to exist, based on information acquired from a tip, the reliability both of the informant and of his information must be indicated. If the tip itself combined with the officer's knowledge of the informant cannot provide probable cause, a search may still be sustainable if the information supplied consists of such detail or is corroborated from independent sources as to remove the doubt that it is worthy of reliance."

*United States v. Montgomery,* 554 F.2d 754, 756–57 (5th Cir.), *clarified on petition for rehearing,* 558 F.2d 311 (5th Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 409, 54 L.Ed.2d 285 (1977); *see United States v. Colon,* 559 F.2d 1380 (5th Cir. 1977). But as our cases make clear, probable cause is not required to justify the type of search to which Vidal-Garcia was subjected. We believe the applicable standard of "reasonable suspicion" is met in a strip search case[3] where the authorities have received infor-

mation as detailed as that received in this case, specifying that a named individual traveling in a specified capacity will be body carrying a particular type of contraband on a particular date and flight, where the identifying portion of that information has been verified by the authorities on the flight's arrival, and where the authorities have no reason to believe the informant is unreliable and have taken affirmative steps to insure that the informant is not being paid for the information and has no criminal record.[4] To hold otherwise would, we believe, be tantamount to requiring probable cause to justify a strip search at the border. We therefore affirm the conviction of appellant Vidal-Garcia.

**IV. The Standard Applied: Afanador**

■ As we have stated, despite the fact that the informant's tip related solely to illegal activity by Vidal-Garcia,[5] the customs authorities in Miami ordered strip

**3.** We note here, as we did in *Himmelwright, supra,* 551 F.2d at 996, in *United States v. Forbicetta,* 484 F.2d 645, 646 (5th Cir. 1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772 (1974), and in *Smith, supra,* 557 F.2d at 1209 n.6, that the instant case does not involve "a probing search of body orifices." *Id.* While upholding the strip searches involved in these cases, we have already stated that "any further [more intrusive] search may well have been constitutionally impermissible." *Himmelwright, supra,* 551 F.2d at 996.

**4.** In *Himmelwright,* we stressed that in the context of intrusive border searches, the "reasonable suspicion" standard "includes a requirement that customs officials have cause to suspect that contraband exists in the *particular place* which the officials decide to search." 551 F.2d at 995 (emphasis in original). We noted "that the search of Himmelwright progressed through several stages. First, her luggage was routinely searched. Next, she was orally questioned . . . . Third, her outer garments were searched . . . . Fourth, her exterior body surface was examined." *Id.* This pattern of search, from the less intrusive to the more intrusive, will normally be the appropriate pattern. In many cases, a "fruitless search of the person's luggage may well dispel the reasonableness of any previously held suspicions." *Id.* Nevertheless, in *Himmelwright,* we specifically anticipated that cases might arise in which the very nature of the suspected crime and the reason for suspi-

cion might justify a strip search regardless of the results of a primary luggage search or of questioning by authorities. We believe this is such a case; information that Vidal-Garcia would be body carrying contraband, *see* note 2 *supra,* rendered the physical search reasonable notwithstanding the fruitless search of Vidal-Garcia's luggage. We do not suggest, *see* note 3 *supra,* that on the facts of this case, a more intrusive body cavity search would have been justified. In each case, the nature of the tip, the reliability of the informant, the degree of corroboration, other factors contributing to suspicion or the lack thereof, and the nature and extent of the search must all be assessed. We reject the government's contention that a showing sufficient to create "reasonable cause to suspect" in a case involving the search of a suitcase, *Stassi v. United States,* 410 F.2d 946 (5th Cir. 1969), is necessarily sufficient to meet the more exacting standards applicable to more intrusive strip or body cavity searches. See text at p. 1328, *supra.* The human body and its habiliments are more sacrosanct than luggage and other equipage.

**5.** There is a suggestion in the record that the informant may have mentioned the names of other Aerocondor employees, but no indication that the tip linked any other members of the crew to importation or possession of contraband.

searches of all six Aerocondor crew members. Nothing was found on four; however, a quantity of cocaine was discovered under the girdle of appellant Afanador. We conclude that the reasonable suspicion standard was not satisfied as to Afanador and that her motion to suppress should have been granted.

The government advances two theories to justify the strip search of appellant Afanador. First, the government maintains that Afanador matched the "smuggling profile" discussed by this court in *United States v. Forbicetta,* 484 F.2d 645 (5th Cir. 1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772 (1974). The elements of that profile are set forth in a passage from that opinion which we reproduce in the margin.[6] The record in our case discloses that Afanador arrived in Miami after working Aerocondor flight 204 as a stewardess. She was attired in the customary Aerocondor stewardess' uniform, described by the government witness as "a white blouse with bright orange-like leisure suit type of top, topcoat, whatever, and a skirt." The top was further described as a blazer-type, "loose-fitting" jacket. There is no suggestion in the record that Afanador's mode of dress played any part whatsoever in the decision to subject her, or any of her fellow crewmembers, to a strip search. In view of

these facts,[7] we simply cannot take seriously the suggestion that these searches can be justified to any degree by application of the *Forbicetta* "smuggling profile." Even if Afanador's conformity with such a profile were established, we would be governed by our statement in *Himmelwright, supra,* 551 F.2d at 995, that "a generalized suspicion of criminal activity such as that which is fostered, for example, when one closely resembles a 'smuggling profile' will not normally in itself permit a reasonable conclusion that a strip search should occur." The fruitless search of Afanador's luggage and the failure to elicit suspicious information on questioning would, in these circumstances, preclude this justification for a strip search.

The government's second argument, stripped to its essentials, is that the reasonable suspicion established as to Vidal-Garcia somehow carries over to Afanador and other members of the Aerocondor crew. The government's brief is admirably forthright in its explanation of the factual basis for this search:

> the customs inspectors were instructed by their superiors to search the entire crew, because they had a tip that one crew member was a body carrier. [A c]ustoms inspector . . . testified that it is routine practice on the part of the inspectors to conduct a secondary body search

6. [A] high percentage of the individuals discovered in the act of attempting to smuggle cocaine at the Miami International Airport arrived on flights from Bogota; the American women discovered in this activity were usually young, clean looking, and traveling alone; women discovered carrying cocaine on their persons usually wore loose-fitting dresses to conceal the bulkiness of the packages hidden beneath their clothing; usually when an official could not see the contours of a feminine figure under loose-fitting dresses, even when the subject was in a bending position, the wearer generally had something strapped to her waist; individuals attempting to smuggle cocaine usually carried only one suitcase and no items to declare so as to clear customs quickly; it had been observed that it was very unusual for young people to go on vacations to Colombia if they had no relatives there; and the usual airline female traveler ordinarily wore tight-fitting clothes. 484 F.2d at 646.

We note that subsequent cases have cast considerable doubt on whether these characteristics standing alone would justify a body search today. *See Himmelwright, supra,* 551 F.2d at 996 n.13, *Smith, supra,* 557 F.2d at 1209 n.4. The profile may have its utility, but we cannot countenance its use to perform plastic surgery disfiguring the fourth amendment.

7. Afanador's mode of dress does not closely resemble the profile. It cannot be said that she selected her outfit for the purpose of concealing contraband, nor is there any suggestion that Aerocondor Airlines included potential for concealing contraband in its design specifications for stewardess' uniforms. The other elements of the profile are almost completely inapposite. To permit the profile to establish reasonable suspicion on the facts of this case would sanction indiscriminate strip searches of virtually all airline stewardesses at the whim of DEA agents. This we refuse to do.

[strip search] of the entire crew if there is suspicion as to one and that to her knowledge the inspectors never single out a specific crew member.

■ Lest there be any doubt, we state here that "reasonable suspicion" must be specifically directed to the person to be searched. While in narrowly limited circumstances the degree of suspicion as to an already suspicious individual may be somewhat enhanced by virtue of suspicious activity by a closely linked traveling companion at the border, *United States v. Wilson,* 488 F.2d 400 (5th Cir. 1973), *cert. denied,* 416 U.S. 989, 94 S.Ct. 2397, 40 L.Ed.2d 767 (1974),[8] the fourth amendment does not permit any automatic or casual transference of "suspicion." Though a Siamese symbiosis need not be demonstrated, more than physical companionship and/or a working relationship is required. Here there was no independent basis for suspicion of appellant Afanador. She was not the subject of a tip; nothing contained in her luggage gave rise to suspicion; there is no indication that her demeanor was in the least suspicious. There was no attempt to elicit information from Afanador, or from other members of the crew, by questioning. Rather, in accord with "routine practice," all six members of the crew were subjected to degrading strip searches. We do not view members of an airline crew as a suspicious gang, and reject the casual transference of "suspicion" among a group of persons traveling together as a means of justifying such searches. Only where reasonable suspicion is specifically directed to the individual to be searched, as was the case with appellant Vidal-Garcia, may an intrusive search be conducted.

While we are cognizant of the serious problems of controlling drug traffic at Miami International Airport, we are not prepared to create there a special enclave exempt from the operation of the United States Constitution. The balance we have sought to strike in border search cases between the level of official intrusion into individual privacy and the public interest to be served by such intrusions, *Himmelwright, supra,* 551 F.2d at 994, a balance which permits searches and seizures to be based upon less than probable cause, fully reflects "[t]he national interests in self-protection and protection of tariff revenue," *United States v. Brennan,* 538 F.2d 711, 715 (5th Cir. 1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977), present at the national border. In a civilized society, one's anatomy is draped with constitutional protections. The fourth amendment does not permit us to give border agents a freer hand or a more probing eye.

AFFIRMED as to appellant Vidal-Garcia.

REVERSED as to appellant Afanador.

---

**8.** In the *Wilson* case, Jones, a young man, and Miss Wilson, a young woman, arrived together on a flight from the Bahamas and so presented themselves at customs "so the inspector assumed they were married or traveling together and before examining any of their luggage inquired whether they were traveling together." 488 F.2d at 401. The answer was affirmative. Further, Jones had a plaster cast on one leg and Miss Wilson was wearing a long dress capable of concealing contraband, both factors viewed by the court as triggering suspicion in themselves. On examining Jones' suitcase, the inspector found a marijuana seed and a spent cartridge containing a white flaky powder, as well as a miniature spoon. The inspector informed Jones he must submit to a secondary inspection, at which time Jones tossed an airline ticket to Miss Wilson. Miss Wilson was then taken to an examination room and subjected to a search in which cocaine and a small quantity of marijuana were discovered. The *Wilson* court concluded that in light of these facts, there was sufficient suspicion to justify a border search of Miss Wilson.