**UNITED STATES of America, Plaintiff,**

v.

**Oscar BURGOS, Camilio Vargas, Luis Eduardo Nossa-Sanchez, Defendants.**

**No. 79-329-CR-EPS.**

United States District Court,
S. D. Florida,
Miami Division.

Feb. 20, 1980.

Linda Carroll, Asst. U. S. Atty., Miami, Fla., for plaintiff.

Steven E. Kreisberg, Miami, Fla., for Burgos.

Alfred Fuente, Miami, Fla., for Nossa-Sanchez.

Fred Moreno, Asst. Public Defender, Miami, Fla., for Vargas.

## MEMORANDUM OPINION AND ORDER

SPELLMAN, District Judge.

The three defendants in this case have filed objections to the Magistrate's Report and Recommendation that recommends that cocaine seized by customs agents on September 24, 1979 should not be suppressed. For the following reasons, the Report and Recommendation is adopted in part, and the Motion to Suppress is DENIED.

At an evidentiary hearing before Magistrate Shapiro, the following facts were established. Sometime in August of 1979, a confidential informant notified Customs Patrol Officer Blair that the vessel "GEMMA I" would be arriving in Miami from Colombia, South America, with a large amount of cocaine. The report also indicated that a seaman named Cardona was involved in the transportation of the substance. On September 24, 1979, at about noon, the "GEMMA I" arrived at Miami, and docked at the Bernuth Marine Shipping Company dock. Customs inspection and clearance were performed on the vessel between that time and 2:00 P.M. No one was permitted off the boat after 2:00 P.M. Between 2:00 P.M. and 3:00 P.M., the vessel was not under surveillance and anyone could have left the "GEMMA I" without interrogation or inspection. At the time, there was a second foreign ship at the dock, the "FEDROS."

At 3:00 P.M., surveillance was established. Cardona left the ship at 6:00 P.M. and was immediately searched, but no cocaine was found. At 11:00 P.M., CPO Benavente and CPO Larison went on duty and began conducting surveillance from an automobile located at the easterly end and outside the Bernuth Marine Complex. From this point, the agents could observe the stern portion of the "GEMMA I" and also the small open gate of the Complex. A blue Chevrolet was observed at 11:10 P.M. parked immediately outside the Complex. (The record is devoid of when it arrived.) At 12:50 A.M., three men were seen by the agents from a distance of 100 yards, exiting the small gate and moving rapidly, with one of the men entering the backseat of the vehicle in an "awkward" manner.

The agents followed the car, activating their lights and siren, and stopped it a few blocks away at a closed but lighted Chevron station. The officers got out of their car with guns drawn. CPO Benavente, while approaching the blue Chevrolet, observed through the window between defendants Vargas and Nossa-Sanchez some plastic bags about ten inches square with white tape on them and containing a white substance, which later tested to be cocaine. Defendants were ordered out of the car and arrested. The "GEMMA I" was searched the next day and cocaine was found in the cabin of seaman Cardona.

Magistrate Shapiro concluded that the agents had reasonable suspicion to search anyone coming off either of the ships and leaving the dock area at the time in question and acting in the manner described. Therefore, the border search of the defendants was constitutional and the subsequent seizure was valid under the "plain view" doctrine. In objecting to the Magistrate's findings, the defendants take two positions. First, that the search was invalid because the customs officials had no reasonable suspicion as to these particular defendants, since the only information they possessed related to seaman Cardona alone. *See United States v. Afanador*, 567 F.2d 1325, 1331 (5th Cir. 1978). Second, that the offi-

cers acted in a manner such that the stop of the vehicle amounted to an arrest under *United States v. Beck*, 598 F.2d 497 (9th Cir. 1979) and *United States v. Morrison*, 546 F.2d 319 (9th Cir. 1976). This being an arrest without probable cause and therefore invalid, the subsequent "plain view" seizure would also be infirm under the "fruit of the poisonous tree" doctrine. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

## I.  REASONABLE SUSPICION

■ Defendants have conceded that the stop of their car at the gas station was at the border or its functional equivalent. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1972); *United States v. Brennan*, 538 F.2d 711 (5th Cir. 1976). Therefore, this Court is faced with determining what constitutes sufficient cause to permit a search on the facts in this case. It is clear that the standard of reasonableness for border searches is less than probable cause and that such a search does not require a warrant. *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Almeida-Sanchez v. United States, supra.*

■ The courts speak broadly of the reasonable suspicion standard. This test has been adopted in the Fifth Circuit based on its inherent flexibility, as opposed to the "real suspicion" standard of the Ninth Circuit. *See United States v. Himmelwright*, 551 F.2d 991 (5th Cir. 1977); *United States v. Smith*, 557 F.2d 1206 (5th Cir. 1977). In this context, the reasonableness of a search will depend on the nature of the intrusion into the privacy interest affected, as balanced against the public interest to be served by that intrusion. *United States v. Himmelwright, supra* at 994; *United States v. Afanador*, 567 F.2d 1325 (5th Cir. 1978). The recognition of the use of such a sliding-scale standard is reflected in the *Afanador* opinion wherein it is stated (567 F.2d at 1328):

"Thus, what constitutes 'reasonable suspicion' to justify a particular search may not suffice to justify a more intrusive or demeaning search."

In *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), respondent was ordered out of the car after being stopped for driving with an expired tag. As he exited the car, a bulge was seen under his jacket, and a frisk revealed a loaded revolver. In reversing the Pennsylvania Supreme Court's holding that the revolver was seized in violation of the respondent's Fourth Amendment rights, the Supreme Court of the United States stated that the order to get out of the car was reasonable when weighing the officer's concern for his safety against the limited intrusion that it entailed (434 U.S. at 111, 98 S.Ct. at 333):

"Against this important interest we are asked to weigh the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. We think this additional intrusion can only be described as *de minimis.*"

In the recent case of *United States v. Miller*, 608 F.2d 1089 (5th Cir. 1979), the Court of Appeals held that the removal of defendants' car to the shoulder of the road was not unreasonable, and the pistol seized in plain view by the officer did not violate their constitutional rights under the fourth amendment. The *Miller* Court analogized this intrusion to the lawful inventory of a car, and indicated that under the circumstances in that case the intrusion was minimal when balanced against the legitimate concerns for the efficient operation of a lawful roadblock, and the travel rights and personal safety of others traveling the road. (*Ante* at 1098–99). In so holding, the Court of Appeals recognized that this balancing approach should be applied to situations other than those which are solely concerned with police safety.

Applying this standard to the facts in our case, the agents observed three men at a late hour moving quickly to a vehicle

parked in the dock area under surveillance for possible narcotics importation. The agents had information which linked one of the crewmen of the "GEMMA I" to the narcotics operation. One of the men moved awkwardly into the vehicle so as to arouse their suspicions. The agents acted immediately from their position 100 yards away and chased the vehicle down at a service station close by. Upon exiting their car, one of the officers saw contraband in plain view before the defendants could even get out of the blue Chevrolet. Based on the information possessed by the officers and their observations of these defendants, the actions of the customs officers were totally consistent with the constitutional dictates of the fourth amendment.

■ The constitutionally cognizable intrusion into defendants' privacy in this case was the investigatory stop or seizure of the car at the border or its functional equivalent. This is not a case such as *Afanador, supra*, where a strip search was undertaken, or a body-cavity search as in *Himmelwright, supra*. If such an intrusive search or seizure were before this Court, then there is no question that a stronger showing of reasonable suspicion would be required even at the border of its functional equivalent. In holding so, this Court recognizes that searches and seizures at the border constitutionally require "something more than . . . broad and unlimited discretion . . ." *United States v. Brignoni-Ponce, supra* 422 U.S. at 882, 95 S.Ct. at 2581. Under the circumstances of this case, the investigatory stop and attendant "plain view" seizure satisfy the "reasonableness" requirement of the Fourth Amendment.

Defendants argue that the intrusion is made more serious by the fact that the arresting officers drew their guns while approaching the automobile which they occupied. Considering the facts in this case, the area of the stop, the lateness of the hour and the actions of the defendants which gave rise to reasonable suspicion, no other course could be prudently followed. *Pennsylvania v. Mimms, supra* 434 U.S. at 110–11, 98 S.Ct. at 333; *Terry v. Ohio*, 392

U.S. 1, 23, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968); *United States v. Broomfield*, 336 F.Supp. 179, 184–85 (E.D.Mich.1972).

## II. THE VALIDITY OF THE "PLAIN VIEW" SEIZURE

■ Viewing the record in this case, the Court cannot agree with defendants that at the time of the stop the circumstances present and the activities of the agents were such as to amount to an invalid arrest without probable cause, thereby rendering the attendant "plain view" seizure without constitutional justification. Defendants cite two cases from the Ninth Circuit for authority, *United States v. Beck*, 598 F.2d 497 (9th Cir. 1979) and *United States v. Morrison*, 546 F.2d 319 (9th Cir. 1976). Both are inapposite to the present case.

The oft-cited definition of an arrest from the case of *Brinegar v. United States*, 165 F.2d 512, 514 (10th Cir. 1948), aff'd 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) is as follows:

"To constitute an arrest, there must be actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained."

This definition is not necessarily at odds with the definition in *Beck*, cited by defendants, which indicates that the surrounding circumstances and not the officer's intent is of primary importance in determining whether an arrest has been effectuated. Although there is no question that the defendants' freedom of movement was momentarily curtailed, under the circumstances it cannot be stated that the officers had either the intent to do more than question the defendants, or that the defendants knew it to be otherwise. Nor does the fact the officers drew their guns transform this investigatory stop into a full blown arrest. As stated in Part I of this opinion, the drawing of guns was a reasonable precaution for the agent's safety.

Unlike the *Beck* case, there was no earlier search of defendants, which would reasonably lead them to conclude they were under arrest. Nor was the stop in broad daylight

as in that case. There is additionally no indication that defendants knew the guns were drawn at the time the contraband was seen by CPO Benavente in plain view.

Nor is the *Morrison* case controlling here. In *Morrison*, there was no reasonable suspicion prior to the officers approach to the defendant. Here, the officers had reasonable suspicion to detain the defendants at the border or its functional equivalent at the time of the seizure.

Under all the circumstances, the Court concludes that the investigatory stop was reasonable and did not constitute an arrest, therefore, the "plain view" seizure was valid and not the fruit of unlawful activity, and the contraband seized constitutionally. *See Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

## III. ORDER

It is hereby

ORDERED AND ADJUDGED that the Report and Recommendation of the Magistrate is adopted as reflected in this Memorandum Opinion, and the Motion to Suppress is DENIED.